Filed 12/11/20  In re L.S. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.S., a Person Coming Under the Juvenile Court Law. | B305471 (Los Angeles County Super. Ct. No. 19CCJP07016) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.S., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jana M. Seng, Judge.  Affirmed.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

Appellant D.S. (Mother) challenges dependency jurisdiction over her daughter L.S. The court found L.S. "is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent." (Welf. & Inst. Code, § 300, subd. (c).)[1] Substantial evidence supports the court's conclusion that Mother is the instigator. We affirm.

## FACTS AND PROCEDURAL HISTORY

L.S. was born in 2009. In 2019, respondent Department of Children and Family Services (DCFS) was notified that L.S. had threatened to kill herself and begged her father R.S. (Father) to kill her. Mother acknowledged that L.S. grabbed a pocketknife and said, "I want to hurt myself."

L.S. was placed on a psychiatric hold in April 2019. She told a clinician "she thinks about killing herself three times a day. [L.S.] wants to be stabbed, have someone shoot her or run into traffic. [She] is often angry and sad as [her] parents do not get along . . . and the custody exchanges are at the police station."

L.S. told a case worker that "she did state that she wanted to die but denied having a plan and reported not remembering why she said she wanted to die." L.S. said Mother smokes marijuana at home "all the time"; Mother confirmed that she smokes marijuana every day. She has a history of drug abuse that includes two years of daily methamphetamine use. Father claimed that Mother and the maternal grandmother (MGM) still use methamphetamine. Mother refused to test voluntarily for drugs, insisting that a judge must order tests.

Mother and Father divorced in 2017. Mother keeps L.S. out of school because she does not want L.S. to visit Father after school, as required by a family court custody order. Mother refused to sign a truancy contract arising from L.S.'s absences from school. Father

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

rarely saw L.S. because Mother prevents visits. Mother accused Father of being emotionally abusive. L.S. said Father "scares me" and "stresses me out." She does not want to see him because he is "mean" and once spanked her bottom, over her clothing.

DCFS was notified in September 2019 that L.S. had a physical altercation with Mother. L.S. told a teacher that Mother pinned L.S. to the bed and yanked L.S.'s hair. L.S. told a social worker that Mother criticized L.S.'s behavior. L.S. threw a pillow at Mother, who responded by pulling L.S.'s hair, causing pain. L.S. then pulled Mother's hair. L.S. missed school that day because Mother prohibited L.S. from leaving her bedroom. L.S. said she feels safe living with Mother.

Mother viewed L.S. as the aggressor in the altercation. Mother stated that L.S. "slam[med] into me" and hit Mother's face. Mother was knocked over and fell onto L.S.'s bed. As she fell, Mother reached up and caught L.S.'s hair by accident. In response, L.S. grabbed Mother's hair and hit Mother's head and shoulders. Mother said L.S. "decided not to go to school" after their fight. According to Mother's boyfriend Lyle E., Mother told him, "[L.S.] is pulling my hair, so I pulled hers."

Parental animosity spilled into public settings. At L.S.'s school, their confrontations required police intervention. Mother yelled, "I need to protect my daughter from him!" and showed Father her middle finger. When the social worker advised Mother not to go to L.S.'s school on days when Father has visiting rights after school, Mother accused DCFS "of abusing Mother and siding with Father and [the] child's school."

The social worker opined that Mother "fails to understand that [her] involvement during Father's visitation day at school affects child emotionally; and could possibly trigger child to react in a certain manner after observing Mother's reaction to Father." School staff said L.S. was going "into a shell." The family court sought to transfer the case to dependency court in August 2019 due to the parents' "toxic relationship."

3

DCFS filed a petition alleging that Mother physically abused L.S. by pulling the child's hair, causing unreasonable pain and suffering and placing her at risk of serious physical harm, damage and abuse (§ 300, subd. (a)); Mother's physical abuse of L.S., history of drug abuse and mental illness, and her and her live-in companion's use of marijuana endanger L.S. and render Mother unable to care for the child (*id.*, subd. (b)); Mother and Father emotionally abused L.S. by exposing the child to their custody battle (*id.*, subd. (c)).

At the detention hearing in October 2019, the court found a prima facie showing that section 300 applies to L.S. The parents kept custody but were ordered not to disparage each other or discuss the case. Mother was ordered to undergo drug testing.

In December 2019, L.S.'s school reported that L.S. might be sexually abused at the home of a friend where she goes to sleep-overs. Mother knows a resident at the home is a registered sex offender yet had no concerns about L.S. staying there. Because of the open dependency case, Mother decided that future playdates would be held at her house. Mother accused L.S.'s school of making a sexual abuse report because the school staff does not like Mother. Mother said L.S. has urinary tract infections and was "peeing on herself" if she had to see Father. Mother continued to keep L.S. at home on days when she is scheduled to have after-school visits with Father.

Father was upset to hear that L.S. has overnight visits at the home of a sex offender. He noticed that L.S.'s panties are dirty and advised L.S. to clean herself properly. His visits with L.S. have gone well since DCFS intervened. He opined that Mother abuses drugs, though she may have stopped while undergoing court-ordered drug tests. Mother tested positive for marijuana and hydrocodone in November and December 2019. Mother said she "is only trying to protect" L.S. from Father and feels his visits should be supervised because he scares L.S. and was abusive in the past.

Mother denied harming L.S., saying that L.S. attacked her; as Mother fell, she accidentally grabbed L.S.'s hair and pulled L.S. down with her. L.S. grabbed Mother's hair, causing Mother to tell L.S., "I

4

wouldn't let go [of her hair] until she let go of mine. When [L.S.] let go of my hair, I told her don't ever fucking put your hands on me. [L.S.] started screaming bloody murder after that and started slamming the door against the wall and against her head." Mother believes L.S. misbehaved because she had an upcoming visit with Father.

Mother stated that she smokes marijuana at home daily "for the high." She "has experimented with methamphetamine, alcohol, cocaine, heroin, acid and shrooms." MGM encouraged Mother "to party." In 2018, MGM was hospitalized and tested positive for methamphetamine.

Mother was diagnosed with bipolar disorder in 2005 and takes five prescribed medications. Mother said her companion, Lyle, "has smoked marijuana his whole life" but denied that it affects his ability to act appropriately with L.S.

Mother admitted to clashing with Father at L.S.'s school, requiring police intervention. Mother blamed Father for L.S.'s psychiatric hold and for scaring L.S., stating that L.S. "has to lie to her therapist about how she really feels about her father or how visits are going because she does not want to get in trouble."

L.S. said Mother "pulled her hair and it hurt her but [L.S.] explained [that] this has never happened before." L.S. feels safe with Mother and Lyle. She gets upset because Father calls police when she does not want to see him. He is mean and makes her stay with the paternal grandmother. L.S. is happy living with Mother and does not like going with Father. She was unable to say why she fears Father or how he is mean to her. L.S. said "she cannot feel when she is peeing or pooping on herself, it just happens." Her school gives her clean pants to change into. Her attendance at school remained poor.

Father stated that he and Mother were initially cordial while co-parenting. Mother's attitude changed after Father had an aneurism and stroke, and Mother argued with the paternal grandmother. Father would like to see L.S. more often, was sad that he was not allowed to see her for months, and believes her needs could be better addressed if

5

the parents worked together. Mother agreed that co-parenting is critical and is willing to engage in counseling.

L.S.'s therapist observed during a counseling session that L.S. and Father laughed and had fun while playing a game and making plans for their evening together. The social worker opined that the parents' "tumultuous relationship" hampers co-parenting and has led Mother to interfere with Father's visits, which affects L.S. emotionally. During a school meeting in January 2020, Mother publicly disparaged Father in front of a large group of people, including L.S.

The jurisdiction hearing was held on March 3, 2020. Father testified that Mother prevented him from seeing L.S. for six months, though his visits were scheduled by the family court. Mother showed up at L.S.'s school on days when Father had an after-school visit. Law enforcement had to ensure that Father's visits took place. Custody exchanges are made at a police station. Mother justifies L.S.'s school absences by saying she is protecting L.S. from Father. L.S. has never told Father she does not want to see him. They are having conjoint counseling to rebuild the relationship Mother damaged by preventing their visits.

### *The Court's Findings*

The court sustained one allegation against Mother. It found under section 300, subdivision (c) that "Mother's conduct does place this minor at substantial risk of suffering serious emotional damage evidenced by severe anxiety, depression, withdrawal, [and] untoward aggressive behavior towards herself." She keeps L.S. from visiting Father or attending school and causes disturbances requiring police intervention. Mother's false accusations that Father abuses L.S. caused the child to exhibit anxiety and places her "at a substantial risk of suffering severe anxiety and emotional harm." Mother's conduct caused L.S. to be involuntarily hospitalized with suicidal thoughts, to urinate and defecate on herself, withdraw from school, and be sad and angry. The court dismissed the other allegations against Mother.

The court found Father to be a calm, credible witness who was protective toward L.S. He did not react to Mother making faces and

6

gestures at him while he testified. He was restrained, making no disparaging statements about Mother's drug use or mental fitness. The court dismissed Father from the petition. He is not a party to this appeal.

The court left L.S. in the physical custody of both parents under DCFS supervision. L.S. was referred for individual and conjoint counseling. Father was ordered to participate in conjoint counseling with L.S. and a co-parenting program. Mother was ordered to submit to on-demand drug testing upon suspicion she is using drugs. She must participate in conjoint counseling with L.S., individual counseling to address child discipline and school attendance, and a co-parenting program.

## DISCUSSION

Mother contests the court's exercise of jurisdiction. On appeal, we uphold jurisdictional findings if they are supported by substantial evidence. We review the entire record, resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment. (*In re R.T.* (2017) 3 Cal.5th 622, 633; *In re Israel T.* (2018) 30 Cal.App.5th 47, 51.)

Dependency jurisdiction is established if the evidence shows (1) the child "is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self" and (2) the child's suffering is caused by parental conduct. (§ 300, subd. (c); *In re Alexander K.* (1993) 14 Cal.App.4th 549, 557.)

First, substantial evidence shows that L.S. is suffering serious emotional damage. She begged Father to kill her and grabbed Mother's pocketknife, saying she wanted to hurt herself. While involuntarily hospitalized, she disclosed having suicidal thoughts three times a day and wanted to be shot, stabbed, or to run into traffic. (See *In re Roxanne B.* (2015) 234 Cal.App.4th 916, 921–922 [minor hospitalized with suicidal ideation is at risk].) School staff state that L.S. is increasingly withdrawn. She urinates and defecates on herself at school. Her behavior is evidence of serious emotional damage.

7

Second, substantial evidence shows that Mother's conduct causes L.S. emotional distress. Mother keeps L.S. from school to prevent Father's after-school visits, negatively impacting L.S.'s relationship with Father and her schooling. Mother refused to sign a contract to ensure L.S.'s school attendance.

Mother publicly communicates animosity toward Father, causing disturbances at L.S.'s school requiring police intervention to carry out family court visitation orders. The situation was so fraught that the family court sought juvenile court intervention. During her hospitalization, L.S. said she is "often angry and sad" because the parental relationship is so tense that custody exchanges take place at a police station.

The court could reasonably infer that Mother's reaction to Father triggers L.S.'s emotions on visitation days. It has caused L.S. to go "into a shell" at school. There is no evidence that Father abuses L.S., only Mother's false accusations against him.

Mother has not recognized the inappropriateness of her behavior or expressed willingness to change. (Compare *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1381 [parents realized their dispute was harming their son and were committed to changing their behavior patterns].) She takes no responsibility for her conduct and blames others—Father, school staff, police, and DCFS—for conspiring against her. She violated the dependency court's order not to disparage Father in front of L.S. Mother has so little self-control that she made faces and gestures at Father during his testimony at the jurisdiction hearing.

Mother engaged in a physical altercation that hurt L.S. L.S. said Mother deliberately yanked her hair; live-in companion Lyle told DCFS that Mother admitted pulling L.S.'s hair. Afterward, the child began screaming and slamming the bedroom door against her head. Mother denied any misconduct and blamed L.S., who reported Mother's conduct to school staff.

Mother's "regimen of psychological warfare cannot help but subject [L.S.] to a substantial risk of emotional harm." (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 84.) Mother has "turned a

8

blind eye to the substantial risk of emotional damage" she is causing. (*Id.* at p. 85.) The court could reasonably infer that Mother is using L.S. as a pawn to avenge her anger toward Father. Mother provokes L.S.'s emotional distress when the child has scheduled visits with Father. When Mother is not stoking anxiety, L.S. is able to enjoy Father's company. A therapist observed L.S. and Father laughing and having fun together. His relationship with L.S. has improved since DCFS intervened.

It is true that "[t]he juvenile courts must not become a battleground by which family law war is waged." (*In re John W.* (1996) 41 Cal.App.4th 961, 975.) However, the courts need not stand by helplessly when parental conduct prompts a 10-year-old child to contemplate suicide. Dependency jurisdiction will protect L.S. while ensuring Mother undergoes counseling to gain insight into appropriate parenting and disciplinary methods, and learns how to control her emotions.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

LUI. P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

9